## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| E-STEPS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAS LEADING FINANCE, LLC; TRAKSECURE CORP.; NICOLAS KOGAN, JANE DOE; CAROLA ACUM, JOHN DOE, VICTOR GARCIA PORRATA, SUSAN ROE; LUIS O'FARRIL, JANE ROE and their conjugal partnerships; CORPORATION ABC, PARTNERSHIP DEF, LIMITED LIABILITY COMPANY GHI, <br><br> Defendants. | Civil Num. 19- <br><br> **COPYRIGHT INFRINGEMENT; TRADE SECRETS MISAPPROPRIATION; BREACH OF CONTRACT; TORTIOUS INTERFERENCE** <br><br> **[DEMAND FOR JURY]** |

## COMPLAINT

**TO THE HONORABLE COURT:**

NOW COMES E-STEPS, LLC, [e-STEPS] by and through the undersigned attorneys, and very respectfully states and prays as follows:

### INTRODUCTION

Americas Leading Finance, LLC [ALF] is a company that bills itself as the company that gives its clients a second chance. Of course, when you lend money to folks who did not get it right the first time, you run the risk that said folks default again on their obligations.

To stave off such risks, ALF started to look into the market for a software solution that would provide the tracking of a motor vehicle using GLOBAL POSITIONING SYSTEM [GPS] technology. The innovative use of this technology to assist in the repossession of vehicles allowed ALF to be the first financial institution in Puerto Rico to use it. TRAKSECURE provided ALF with its original proposal, but inflated the numbers, believing that its personal relationship with at least one of ALF's officers would make them swallow the inflated cost.

TRAKSECURE was mistaken, and ALF sought other alternatives, ultimately choosing to enter into a contract to license e-STEPS' solution comprised of its proprietary software, trade secrets and other copyrightable intellectual property subject to confidentiality clauses [the protected assets]. In addition to providing the GPS units and a proprietary tracking software, e-STEPS created and provided an integrated system for ALF to market its financing to car dealers, integrating the installation with the sale of the vehicles and the monitoring of the debtors.

ALF portrayed itself to e-STEPS as more than a licensee, styling itself as a *de facto* partner. e-STEPS sought to protect itself with a sufficiently long term on the contract to assure a just yield on its significant investments in improving ALF's business by reengineering, identifying, functionalizing, structuring, designing and ultimately coding its processes. ALF, being simply a bank, did not know and did not have an Information Technology department or in-house unit, nor had it identified, much less structured, its own business processes. ALF was starting its subprime auto loan business and was looking for a tech company that would have the knowledge, the presence and the means of providing that which it lacked and found it in e-STEPS.

TRAKSECURE, however, remained on the lookout and several months into e-STEPS' contract with ALF, the latter informed e-STEPS that ALF's investors required that ALF diversify its tracking systems' providers. e-STEPS objected, but ALF assured e-STEPS that its protected assets were indeed protected. The diversification consisted of none other than TRAKSECURE. Despite its assurances, ALF proceeded to provide TRAKSECURE with access to e-STEPS' protected assets in order to be able to cancel its contract with e-STEPS once TRAKSECURE was able to offer a substantially similar solution and service. Also, ALF itself used e-STEPS' protected assets to create its own tracking and debt collection platforms.

e-STEPS files this Complaint to ask this Court for all the remedies it is entitled to under 17 U.S.C. §501 *et seq.,* among which are preliminary and permanent injunctive relief to enjoin defendants from further infringing e-STEPS' copyright, to order impoundment and destruction of all infringing materials and trade secrets pursuant to 18 U.S.C. §§ 1831-1839 [the Defend Trade Secrets Act] , and to award to e-STEPS actual damages, doubled pursuant to the Defend Trade Secrets Act, infringers' profits, and costs and attorneys' fees.  e-STEPS also asks

this Court to exercise its supplemental jurisdiction to order defendants to stop using and to return e-STEPS' trade secrets and protected confidential information and to destroy any copies in their possession. e-STEPS finally sues for damages due to the tortious interference with e-STEPS contractual relationships and for the breach of its contract with ALF.

## I.     JURISDICTION AND VENUE

1.   This Court has federal question jurisdiction over this case under the Copyright Act 17 U.S.C. 101 et seq. as well as supplemental jurisdiction to address the state law contract claims.

2.   This Court has also federal question jurisdiction over this case under the Defend Trade Secrets Act of 2016 (DTSA),  which on May 11, 2016 significantly amended the Economic Espionage Act (EEA) (18 U.S.C. §§ 1831-1839) to provide federal jurisdiction over appropriation of trade secrets used in or intended for use in interstate commerce.

3.   Venue is proper in this Court because the causes of action took place in Puerto Rico and all parties are domiciled in Puerto Rico.

## II. THE PARTIES

4.   e-STEPS, LLC is a limited liability company registered to do business in Puerto Rico.

5.   Americas Leading Finance, LLC [ALF] is a limited liability company registered to do business in Puerto Rico, which infringed e-STEPS' copyrights, misappropriated its trade secrets, and breached its contracts.  It also conspired with the other Defendants to achieve the same result.

6.   NICOLÁS KOGAN is the founder and chief executive officer of ALF, who participated actively in the infringement of e-STEPS' copyrights and misappropriated its trade secrets. On information and belief, Jane Doe is his wife, and they form a conjugal partnership.

7.   CAROLA ACUM is the chief operating officer of ALF, who infringed e-STEPS' copyrights and misappropriated its trade secrets. On information and belief, John Doe is her husband, with whom she forms a conjugal partnership.

8.   TRAKSECURE, CORP. is a Puerto Rico corporation, which conspired with ALF to infringe

e-STEPS' copyrights, misappropriate its trade secrets, and breach its contract with ALF.

9.    VICTOR GARCIA PORRATA is the chief executive officer of TRAKSECURE, who participated actively in the infringement of e-STEPS' copyright. On information and belief, Susan Roe is his wife, and they form a conjugal partnership.

10.   LUIS O'FARRIL is the engineer in TRAKSECURE who worked directly with GARCIA to infringe e-STEPS' copyright. On information and belief, Mr. O'Farrill is married to Jane Roe, and they form a conjugal partnership.

### III. THE FACTS

11.   e-STEPS owns a copyrighted system that links individuals to the vehicles ALF finances; locates those vehicles as needed; and tracks vehicles as needed, using "GPS." *See* Exhibit 1, the Contract between e-STEPS and ALF at 1, first paragraph "WHEREFORE;" Exhibit 2, the copyright registration TX 8-679-684, Exhibit 3, copyright registration TX-706-911, and Exhibit 4, copyright registration TX-733-463.

12.   e-STEPS also owns the infrastructure necessary to track vehicles via computer and/or cell phone with equipment, platforms and networks. *Id.*

13.   e-STEPS operates the system and its infrastructure as an essential part of its business. *Id.*

14.   ALF initially needed a GPS tracking system for the vehicles it was financing and decided that because it lacked the knowledge, resources, expertise and proper means, instead of developing a software solution in-house, it needed to outsource the work.

15.   ALF asked TRAKSECURE for a proposal.

16.   TRAKSECURE's president found out that one of ALF's officers in charge of evaluating the proposal, Juan Ramon (Moncho) Gutierrez Rodriguez was an acquaintance and inflated the number on the proposal and its potential profit.

17.   Mr. Gutierrez rejected the proposal with the inflated numbers.

18.   TRAKSECURE lost the business and resented it.

19.   Next, ALF's officer sought recommendations and was directed to e-STEPS, which prepared a proposal based on ALF's top officers' representations about volume of vehicles that would need to be tracked and representations based on business projections of ALF's financing market.

20.   ALF entered into a contract with e-STEPS on June 18, 2015 to provide a complete Information Technology (IT) solution to track the spatial location (latitude and longitude via Lambert coordinates using the GPS technology) of motor vehicles that served as liens to the loans that ALF had granted its clients.

21.   ALF is the only financial institution in Puerto Rico that uses GPS technology to track vehicles it uses as collateral.

22.   In turn, the solution developed by e-STEPS, comprised of its source code, object code, the structure, sequence, and organization of both the program as an integrated whole and the program's individual features, *i.e.,* its modules, subroutines, macros, module substructure (the nesting of one module within another); the control flow (the sequence in which modules perform their tasks), files, data flow (the sequence in which data moves through the program and is operated on by the modules) and the user interface (data input formats and other non-graphical, internal code that enables the user and computer to communicate with one another and result in certain output formats and reports)[the protected trade secrets), became a **competitive advantage** that e-STEPS painstakingly gained over its competitors, among them the disgruntled codefendant TRAKSECURE.

23.   In June 2015, ALF decided to enter into a  contract with e-STEPS in order to sell the GPS boxes that  e-STEPS installs in the vehicles which are financed by ALF to the purchasers.

24.   GPS also decided to contract with e-STEPS to provide it with the means of locating the financed vehicles by GPS, which included, but was not limited to, the equipment, platforms, and networks

necessary to track the vehicles via computers or the cellular network ("the e-STEPS tracking system"). Exhibit 1, the second paragraph of the WHEREFORE clause.

25.    In order to be able to use the e-STEPS tracking system, on June 19, 2015, ALF entered into a contract ("the contract") with e-STEPS called "CONTRATO DE VENTA Y SERVICIO DE LOCALIZACIÓN POR POSICIONAMIENTO GLOBAL ("GPS") PARA LA RECUPERACIÓN DE VEHÍCULOS". *Id* (the entire contract).

26.    The contract's term was 18 months, which would renew automatically unless one of the parties notified the other at least 90 days before the end of the original term of its intention not to renew the contract. *Id.* at 3.

27.    After the end of the first term of the contract at the end of 2016, it was renewed automatically for another 18 months ending on June 18, 2018, when it was renewed anew.

28.    The contract was due to end on December 18, 2019.

29.    At the beginning of the first contract term and for about two months, e-STEPS developed processes and functionalities that it incorporated through the contracted license to the service platform with all the components necessary for the operation of ALF's business.

30.    e-STEPS' benefit as a service provider/partner for ALF was that e-STEPS created the BPP (Business Process Procedure) taking into consideration all the aspects/functionality required for a service like this specifically for ALF.

31.    e-STEPS, through forward thinking and aiming at providing a solution for the Subprime Auto Lending developed functionalities beyond ALF's needs and requirements that ALF later copied and reproduced internally once it discovered the benefits of those functionalities.

32.    The e-STEPS platform is called "TOTAL CONTROL FLEET MANAGEMENT CLOUD SERVICE" and together with the equipment and networks necessary to track vehicles via computers and cellular networks comprises part of the protected assets offered by e-STEPS to ALF as part of the contracted IT solution.

33. e-Steps' copyrighted material are components of the "Total Control Fleet Management Cloud Service."

34. Unlike e-STEPS' system TRAKSECURE's offer was a mere out-of-the-box tracking solution that was not tailored to fit ALF's needs.

35. e-STEPS solution was developed from scratch and built from the ground up thru much effort, time, labor and money.

36. The basic tracking module was developed fairly quickly, and was followed, based on the BPP developed and created by e-STEPS, by other modules and functionalities to make more efficient, not only the tracking of vehicles, but also other major components of the whole process of originating a loan from the very first step of qualifying a client to the last step of disbursement of the loan money after obtaining a custom-made feature document produced by e-STEPS' platform which certified that the GPS unit had been attached to the vehicle, had been activated and was indeed tracking the vehicles location, among other information gathered from e-STEPS' proprietary software platform.

37. The complete solution had a both buy-and-sell component and a monthly service lease component and was e-STEPS' trade secret, as ALF recognized.

38. ALF agreed to buy from e-STEPS GPS units that e-STEPS would install on motor vehicles on-site at the dealership.

39. ALF would obtain consent from the client thru a preprinted form in which ALF represented that the only valid use of the GPS data would be to recover the vehicle only if the loan agreement had been defaulted according to ALF loan agreement terms.

40. Upon being instructed to do so by ALF, e-STEPS would install the GPS unit on the vehicle and would activate it on a third-party M2M mobile network for a fixed fee of $12.00 per GPS unit.

41.    As part of the service lease, e-STEPS granted ALF a limited use license of e-STEPS tracking platform named "TOTAL CONTROL FLEET MANAGEMENT CLOUD SERVICE" ["e-STEPS platform" or "software platform"].

42.    The cost for the use of e-STEPS platform was $3.99 a month with the right to obtain 32 locations in any given month.

43.    Thus, an integral part of the agreement between e-STEPS and ALF was the use of a software platform developed originally and entirely by e-STEPS, copyrighted and registered, comprised of literal and non-literal elements protected under the Copyright Act.

44.    e-STEPS invested money, time and effort to develop its work and took specific measures to protect it via copyright registration, contractual protections and a non-disclosure agreement.

45.    In addition, e-STEPS protected its trade secrets comprised, among other things, of non-public information, sensitive information, processes, know-how, designs, diagrams, software, contracts with its third-party suppliers, and technologies offered as part of the agreement with ALF and took reasonable measures to keep them confidential.

46.    The protected assets include the copyrighted functional specifications the copyrighted software known as Total Control GPS – Web Portal which provides the following functionality:

-    Electronic **Service Request** to install GPS

      o   Dealer Order management portal

      o   Bank Order management portal

      o   Electronic Service Installation Status
          Active/Inactive

      o   GPS Maintenance Request (Quality Management process that ensure the GPS are connecting correctly)

-    **Live Tracking** – Auto vehicle tracking (Speed, location, direction, etc.)

      o   Request for Live Tracking

      o   Stop Live Tracking

   o Live tracking History

   o Live tracking reporting

   o Share the link for live tracking (repossession process)

   o Fleet KPI's

   o Tracking GEO Fence

   o Certification of Installation & Connectivity

- Vehicle **Condition Report**

- **User Profile** Management

- **Billing & Invoicing**

- **Administrative Tools**

47. The **Proprietary software and its unique functionality are among e-STEPS' most valuable assets.**

48. The trade secrets that e-STEPS asks this Court to confiscate from defendants are the platform with all of its modules  that TRAKSECURE uses to provide service to ALF; the collection platform or any other related program that ALF may have developed by using the data from the GPS that e-STEPS has installed and that is managed through the platform that e-STEPS calls  Total Control GPS; any document, email, or written communication that is based on or mentions any concept, idea, or process from the copyrighted Functional Specification and all copies of such documents on the servers of ALF and TRAKSECURE, and whose "senders" or "receivers" are any employee, officer, or independent contractor of ALF or TRAKSECURE, including, but not limited to, such emails from any employee of e-STEPS, and Nicolás Kogan, Carola Acum, Carlo Rodríguez, Klaribel Guevara, Ricardo Cruz, José Ortega, José Correa (IT), Chris Sanchez (IT), Javier Robles, and Juan Gutierrez from ALF and from TRAKSECURE, Victor Garcia, Luis O' Farril, and Neftali Bernard from January 1, 2015 to the present.

49.  Therefore, e-STEPS, having obtained a competitive edge through its creation, took reasonable measures to protect its assets.

50.  e-STEPS granted ALF a restricted technology use license which prohibited ALF from reproducing in any way the technologies offered under the entire agreement. *See* Exhibit 1 at 4.

51.  e-STEPS also incorporated to the agreement a previously signed Non-disclosure agreement that protected Confidential Information, as such term was therein defined, from being disclosed by ALF to anyone else. *See* Exhibit 1 at 6 and Exhibit 5 (Mutual Confidentiality Agreement)

52.  Finally, e-STEPS registered its copyrights on its assets. *See* Exhibits 2, 3, and 4.

53.  Several of e-STEPS assets are trade secrets given the protections sought by e-STEPS evidenced by the reasonable efforts it took to preserve the secrecy of its valuable confidential information.

54.  There is also among e-STEPS assets confidential information protected under the Mutual Confidentiality Agreement, whether trade secret or not. *See* Exhibit 5 at 2 (Definition of "Confidential Information")

55.  e-STEPS started providing its services to ALF, but it was clear from the outset that ALF needed more than a tracking system.

56.  As stated before, through forward thinking and aiming at developing a powerful unique tool for the Subprime Auto Loan Market, e-STEPS developed new functionalities, such as, modules, processes and integration among the different processes, principal or ancillary, required to originate the loans and eventually install the GPS units and provide the vehicles' GPS location.

57.  One of the essential outputs produced by e-STEPS' platform was a certification of installation ["The certificate"] of the GPS without which the loan money could not be disbursed. This certificate was wholly and originally designed by e-STEPS, but most important, all its information fields are gathered from the complex database structure within the platform and are the result of the functional specifications, workflow and underlying structure designed originally by e-STEPS, copyrighted and protected.

58.    ALF always realized the value of e-STEPS' added functionalities and tried to include information/processes and data integration in their internal systems directly from the Total Control platform requesting a "data file upload" that would plug the data produced by e-STEPS platform directly to their Customer Relationship Management (CRM) system.

59.    In addition, ALF included the Certificates of installation as formal documents the dealers provided in order for ALF to release the payment of the vehicles sold.  This certificate was invented and created by e-STEPS and assumed as part of the ALF Lending process once ALF realized the value of such document and the condition report.

60.    e-STEPS saw an opportunity to obtain a unique competitive edge, and trusting that ALF would comply with its contractual obligations and that its asset was protected according to the law, invested money, labor and time to further develop, as stated above, its software platform and did it without any additional cost passed on to ALF.

61.    ALF, in contrast, instead of appreciating  all the hard work already done by e-STEPS decided, by disclosing the e-STEPS' confidential trade secrets to provide its service that it would use the data produced by the GPS units to start reproducing e-STEPS' tracking business and injecting this data on other platforms, especially in its Accounts Receivable and Collections Department.

62.    Nor did ALF stop there. ALF then decided to bring back TRAKSECURE, representing to e-STEPS that its "investors" [Center Bridge Partners] had demanded that ALF not "put all its eggs in one basket".

63.    e-STEPS asked ALF why it was bringing a competitor on board so close to its trade secrets, but ALF's officers, including codefendant Kogan, reassured e-STEPS that e-STEPS had nothing to worry about since the trade secrets were protected by the contract and there was a confidentiality agreement in place between e-STEPS and ALF.

64.    e-Steps reasonably relied on that representation.

65.    If e-STEPS had known then that ALF had in the past tried to misappropriate the loan origination programming of CCM company, then cancelled its contract with CCM, perhaps e-STEPS would not have been so trusting.

66.    In the case of CCM, ALF cancelled its contract when ALF thought it had replicated CCM's work, but ALF was mistaken, so ALF had to reinstate the contract.

67.    With e-STEPS though, ALF sought to be better prepared to succeed in its illegal acts of appropriating e-STEPS' trade secrets, thereby also infringing e-STEPS copyright and breaching its contract.

68.     ALF contracted TRAKSECURE to purchase GPS equipment and for tracking services through GPS under a contract that is considerably like the one between e-STEPS and ALF.

69.    On information and belief, ALF conditioned its agreement with TRAKSECURE and stated that the tracking services provided by TRAKSECURE had to be the *same* as those provided by e-STEPS with the *same* platform functionality, following the *same* procedures that e-STEPS had designed as part of the technologies offered under its contract.

70.    ALF knew or should have known that such conditions violated the confidentiality provisions of its contract with e-STEPS, which included  material, to which e-STEPS holds the copyright as well as trade secrets.

71.    Thus, TRAKSECURE finally fulfilled the frustrated first attempt of obtaining a piece of ALF's business in violation of the Copyright Act and the Defend Trade Secrets Act.

72.    But TRAKSECURE had a big problem. TRAKSECURE only had its out-of-the-box solution that just tracked vehicles and did not have any other modules, functionalities, unique perks and niceties that e-STEPS' platform had.

73.    Once TRAKSECURE's "system" started operating in mid-2016, ALF's phone did not stop ringing with complaint after complaint from car dealers.

74.    Mr. Javier Robles, in charge of dealing with the GPS platforms would have to answer these calls and try to appease the infuriated car dealers.

75.    The inefficiency of TRAKSECURE's limited program caused dealers to lose clients waiting many hours to have a GPS unit installed on the vehicle they wanted to buy.

76.    The dealers complained that sometimes it would take anywhere between five hours and even a day to install a GPS, frustrating the sale of the vehicle since the customer would get tired of waiting and cancel the whole transaction.

77.    Dealers were furious with the business they were losing due to TRAKSECURE's inability to fulfill the services' requests on time.

78.    In contrast, e-STEPS consistently installed a GPS **within just one (1) hour**, once requested to do so thru its platform and had a "ticket manager" module that e-STEPS developed and added to its initial tracking platform**.**

79.    In addition, complaints started within ALF's ranks because TRAKSECURE's system was too rigid and did not take into consideration many details and specific steps in the process of originating a loan, including all the stages and the eventual approval of the loan and money disbursement to the dealer, which had been engineered, designed, developed, integrated and provided by e-STEPS with its specialized knowledge and expertise in the development of IT integrated solutions, the protected trade secrets and copyright.

80.    e-STEPS had invested close to a year of meetings with ALF's personnel, hours of hard work of e-STEPS' own people in developing functional specifications, workflow diagrams and lines of code to develop modules that would tweak the platform and make it efficient, and e-STEPS had also invested enormous effort to fine-tune all the elements and components of the platform.

81.    In-house, at ALF, the complaints were increasing.

82.    ALF's president, codefendant, NICOLAS KOGAN, ordered that TRAKSECURE's system be "the same" as e-STEPS or ALF would terminate the contract with TRAKSECURE.

83.  On information and belief, simultaneously, codefendant KOGAN himself started boasting about e-STEPS' seamless and efficient platform and would assure Center Bridge investors and other potential investors that soon they would no longer need e-STEPS because ALF was developing its own platform.

84.  KOGAN would also instruct ALF's employees, Klaribel Guevara among others, to "show" these people the "live" operating platform from e-STEPS.

85.  However, the TRAKSECURE system was never shown because of its many problems and shortfalls.

86.  e-STEPS did not learn of these statements until January of this year, under circumstances related below.

87.  What followed was a case-study of copyright infringement and trade secrets misappropriation.

88.  ALF's employees and TRAKSECURE's engineers met during the span of more than six months, and ALF's employees gave TRAKSECURE's engineers the trade secrets, confidential information, and copyrighted work, all belonging to e-STEPS.

89.  Simultaneously, in-house developers of ALF started requesting copyright protected and traded secrets pertaining to e-STEPS platform that were being introduced and/or coded into ALF's internal platform.

90.  ALF dismantled not only the Total Control platform, its functionality and its processes, but the very nature of e-STEPS business and services to misappropriate the trade secrets and cause TRAKSECURE to do the same.

91.  By violating e-STEP's copyright and appropriating its trade secrets, TRAKSECURE added other modules to its base tracking program, copied e-STEPS' solutions, functional specifications, know-how and structure to misappropriate e-STEPS' trade secrets and competitive edge and keep ALF's business.

92.    ALF did the same in order to develop an internal platform that would enable disposing altogether of e-STEPS' integrated and contracted IT solution.

93.    The first step was the complete halt of purchase orders for the GPS units that were installed in vehicles.

94.    The last such order was placed by ALF at the end of December 2018.

95.    Up until then, purchases had been between 250 and 300 units every month.

96.    In January 2019, the purchases dropped to zero.

97.    Since then there has been no purchases of any GPS units.

98.    This complete halt of purchases was coupled with a surprising letter that ALF sent e-STEPS announcing its intention of ending the contract effective on April 15, 2019.

99.    However, the termination applied to the monthly leased service since the purchasing of GPS units had been halted since January 1st, 2019.

100.    Sometime in January 2019, e-STEPS president, Mr. Eric Villegas, ran into Mr. Javier Robles, the former ALF employee in charge of its GPS department.

101.    When Mr. Villegas informed Mr. Robles that ALF had communicated its intention of ending the contract and that no purchases of GPS units had taken place since the beginning of the New Year, Mr. Robles came forward and explained how, flooded with complaints from dealers and ALF's own employees, codefendant KOGAN and other ALF's officials, including codefendant CAROLA ACUM, instructed him to show TRAKSECURE exactly how e-STEPS offered its services so that TRAKSECURE could do the same by copying e-STEPS' copyright and misappropriating its trade secrets.

102.    Therefore, in January 2019, e-STEPS learned that ALF, before or contemporaneously with its contract with TRAKSECURE, infringed its copyrights, misappropriated its trade secrets, interfered tortiously with its suppliers and their contractual obligations, and breached its contract with e-STEPS.

103. The infringement, misappropriation, and breach included, but was not limited to, the confidentiality agreement and revealing to TRAKSECURE information about e-STEPS' processes, platform, and the functionality of the technology offered and the infrastructure of e-STEPS so that TRAKSECURE could copy the technologies copyrighted and offered by e-STEPS, which e-STEPS trusted were protected under its contract with ALF to maintain its trade secrets secret..

104. ALF also misappropriated the copyrighted technologies, the confidential information gathered from e-STEPS and its trade secrets, all of which were protected under the contract, and used them to develop, in-house, **tracking and/or debt collection** applications, which it could not have done without violating the clause that restrained ALF from copying the technologies consisting of trade secrets offered by e-STEPS as part of the contracted location service.

105. The illegal disclosure of protected and copyrighted e-STEPS trade secrets took place during meetings between Mr. Robles and other ALF personnel and Co-defendant Engineer Luis O'Farril from TRAKSECURE.

106. Co-defendant Victor Garcia, with Miguel Príncipe, both partners at TRAKSECURE, met with Mr. Robles at ALF's behest.

107. ALF instructed Robles to explain in detail how e-STEPS Total Control platform worked to Garcia and Principe.

108. Robles, seeing that TRAKSECURE's supposed system consisted of a template of only one screen, told TRAKSECURE's employees that the template alone would not work.

109. Robles further told TRAKSECURE's employees that they needed to know how orders were made; how the vehicles would be tracked; and that they needed a ticket manager.

110. TRAKSECURE said that it would provide the service, but was clueless.

111. TRAKSECURE wanted the lienholders to have the GPS tracking systems installed after the deal closed by subsequent appointment because TRAKSECURE did not have the suppliers ready.

That plan was not feasible.

112.  TRAKSECURE originally did things via email, while e-STEPS provided a seamless, constantly connected solution.

113.  TRAKSECURE's programmers insistently asked how e-STEPS did it.

114.  Robles told them that all reports had to be produced by the platform or obtained through it.

115.  The instructions that Robles was giving TRAKSECURE at defendants' behest were intended to cause  TRAKSECURE's system to behave in the same way that e-STEPS did.

116.  Robles told TRAKSECURE programmers that a "paper receipt" to certify the installation of the GPS units that ALF purchased from TRAKSECURE was not acceptable with loan audits and insisted that the receipt has to be done digitally as e-STEPS did it.

117.  TRAKSECURE programmers did not know how e-STEPS did it, so they openly asked Robles, who then showed them the certificate of installation produced by e-STEPS' platform and explained how the data in the certificate was pulled by the platform from different tables within the database structure of e-STEPS' Total Control platform.

118.  This information was e-STEPS' trade secret.

119.  ALF's employee, Ricardo Ortega, who was Robles immediate supervisor, knowing that the certificate of installation was e-STEPS' product, told TRAKSECURE programmers: "You can take a photo of it, but you cannot take it with you".

120.  Right then, Mr. O'Farrill took a picture of the certificate.

121.  Eventually Mr. Robles was instructed to access TRAKSECURE's system which was then able to produce a substantially similar certificate.

122.  Mr. Robles also witnessed on several occasions how ALF employee Klaribel Guevara would show e-STEPS platform to divulge e-STEPS' trade secrets.

123.  As part of ALF's internal procedures, auditors and investors would visit ALF and would review and inspect the loan files approved through both e-STEPS and TRAKSECURE's systems.

124. After comparing them, at least in one instance, the auditors requested that the "Vehicle Condition Report" produced by the TRAKSECURE system had to include photos of the vehicles, which e-STEPS platform included and provided with the report, but TRAKSECURE did not.

125. This information was e-STEPS' trade secret, and defendants misappropriated it.

126. In one of the meetings, engineer O'Farrill was upset at not knowing how e-STEPS carried out certain tasks with their platform and asked point blank how they did it, to which Mr. Robles responded – in compliance with the instructions ALF had given him - showing O'Farrill e-STEPS' platform and each of the screens, features, fields, reports, certificates and other elements of the platform that ALF was prohibited from disclosing to third parties, much less to a direct competitor of e-STEPS.

127. In this way, TRAKSECURE used the functional specifications used for the e-STEP copyright and infringed that copyright and misappropriated e-STEPS' trade secrets.

128. As stated generally above, while TRAKSECURE was infringing e-STEPS rights, ALF was doing its own share when it started developing, in-house, other platforms in its collections department that would feed from the tracking service provided by e-STEPS as a contracted service and protected from replication.

129. ALF eventually stopped using e-STEPS' tracking module and started its own tracking, using e-STEPS' copyrighted material and trade secrets, therefore replicating e-STEPS' main line of business, misappropriating e-STEPS' trade secrets and infringing its copyright.

130. During its commercial relationship with e-STEPS, ALF also gained knowledge of e-STEPS' suppliers of GPS units and M2M services and initiated contact and private conversations with representatives of these entities to bypass e-STEPS, interfering with those contractual relationships.

131. This tortious interference with e-STEPS' contractual and commercial relationships, inherently related to the essence of e-STEPS' business, extended to the M2M service providers TELEFONICA USA and CLARO, suppliers of e-STEPS as well.

132. ALF colluded and conspired with TRAKSECURE to dismantle e-STEPS' business, gather confidential information from e-STEPS and eventually drive e-STEPS out of business.

133. ALF inflicted the death blow in the New Year of 2019.

134. Right after Christmas 2018, ALF contacted e-STEPS, and even though the last meeting held by the parties in 2018 ended with ALF's representation that it would consider e-STEPS' offers giving ALF substantial discounts on GPS units, ALF wrongfully terminated the contract effective on April 15, 2019.

135. The wrongful termination of the contract means the demise of e-STEPS.

136. e-STEPS is about to lose 90% of its recurrent income thus disappearing as a commercial entity.

## III. FIRST CLAIM FOR RELIEF – COPYRIGHT INFRINGEMENT - (17 U.S.C. § 501)

137. e-STEPSs repeats and realleges foregoing paragraphs, as if fully set forth herein.

138. The "Copyrighted Work" as the term is COLLECTIVELY defined in this complaint refers to the original literary works for which e-STEPS has registered its copyright and were created by e-STEPS on or about the time alleged above and on the respective registration. *See* Exhibits 2, 3, and 4.

139. On information and belief, currently, ALF and TRAKSECURE use, operate and commercially exploit for their economic benefit platforms, applications, software, mobile apps, which are based on e-STEPS' copyrighted functional specifications and/or are and/or behave substantially similar to e-STEPS' Copyrighted Work.

140. The Copyrighted Work is an original literary work containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. § 101, et. seq. e-STEPS is

the exclusive owner of rights under copyright in and to the Copyrighted Work. e-STEPS owns a

valid copyright registration for the Copyrighted Work, attached as Exhibits 2, 3, and 4.

Through ALF'S AND TRAKSECURE'S conduct alleged herein, including the reproduction,

unauthorized use and disclosure in violation of the contract of the Infringing Work, which is copied

from and/or derivative of and substantially similar to e-STEPS Copyrighted Work, without e-

STEPS' permission, **<u>all Defendants</u>** have directly or secondarily infringed e-STEPS' exclusive

rights in the Copyrighted Work in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

141.  On information and belief, Defendants' infringing conduct alleged herein was and continues to be

willful and with full knowledge of e-STEPS' rights in the Copyrighted Work, and has enabled

Defendants illegally to obtain profit therefrom.

142.  As a direct and proximate result of Defendants' infringing conduct alleged herein, e-STEPS has

been harmed and is entitled to damages in an amount to be proven at trial. Pursuant to 17 U.S.C. §

504(b), e-STEPS is also entitled to recovery of Defendants' profits attributable to Defendants'

infringing conduct alleged herein, including from any and all income generated thru the use of the

Infringing Work and products incorporating or embodying the Infringing Work, and an accounting

of and a constructive trust with respect to such profits.

143.  e-STEPS further is entitled to its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

144.  As a direct and proximate result of the Defendants' infringing conduct alleged herein, e-STEPS

has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which

there is no adequate remedy at law. On information and belief, unless Defendants' infringing

conduct is enjoined by this Court, Defendants will continue to infringe the Copyrighted Work. e-

STEPS therefore is entitled to preliminary and permanent injunctive relief restraining and

enjoining Defendants' ongoing infringing conduct.

145.  As part of the preliminary injunctive relief e-STEPS prays this Court to order the impoundment of

all copies made or used in violation of e-STEPS' exclusive right and any and all other infringing

articles or materials used to make infringing articles, including specifications, designs, diagrams, source code and object code pursuant to 17 U.S.C. § 503(a)(1).

## IV. THE SECOND CLAIM FOR RELIEF – TRADE SECRETS MISAPPROPRIATION

146.  e-STEPS repeats and realleges paragraphs 1 through 128 hereof, as if fully set forth herein.

147.  e-STEPS owns business information as alleged above that derives independent economic value from not being generally known to or readily accessible by the public through proper means.

148.  e-STEPS took reasonable measures, including but not limited to an NDA agreement incorporated in full to the main contract with ALF, to keep this information secret.

149.  As alleged above, both ALF and TRAKSECURE disclosed or used, and continue to disclose or use, e-STEPS' trade secrets without its express or implied consent and both or either one of them used improper means to acquire knowledge of the trade secrets and at the time of disclosure or use, knew or had reason to know, that the knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use of the trade secrets or derived from or through ALF who owed a duty to e-STEPS to maintain the secrecy of the trade secrets or limit the use of the trade secrets.

150.  Under the Defend Trade Secrets Act of 2016, 18 USCA § 1839, e-STEPS is entitled to an injunction to preserve evidence and prevent trade secrets disclosure and further use, compensatory damages measured by actual loss and unjust enrichment, to the extent not accounted for in the actual loss calculation and exemplary damages of two times the amount of the damages for willful and malicious misappropriation.

151.  e-STEPS is also entitled to reasonable attorneys' fees since the misappropriation in this case was willful and malicious as it has been alleged above.

## V. THE THIRD CLAIM FOR RELIEF – BREACH OF THE AGREEMENT TO BUY GPS UNITS

152.  e-STEPS repeats and realleges paragraphs 1 through 128 hereof, as if fully set forth herein.

153.  When the contractual relationship between ALF and e-STEPS began, ALF agreed to purchase certain quantities of GPS units that increased over time up to 1,000 units a month.

154.  These projections were represented by ALF via email in order to obtain special pricing on the units and the services that e-STEPS would offer.

155.  ALF never complied with its contractual obligation to buy 1,000 units, even though it used that commitment to deceive e-STEPS to get e-STEPS to discount its price per unit based on volume as to marginal profit per unit.

156.  During the contract e-STEPS asked ALF to comply with its obligation, and, in a meeting held in June 2017, codefendant KOGAN, ALF's president and José Ortega, ALF's Risk Supervisor, agreed to buy between 250 and 300 units a month, since by that time TRAKSECURE also sold GPS units to ALF.

157.  Until December 2018, ALF bought units as agreed in the June 2017 meeting, but starting in January 2019 and up to today, ALF stopped buying GPS units in compliance with its contract with e-STEPS.

158.  e-STEPS notified the breach to ALF and demanded that it cure the breach in 30 days as the contract provided.

159.  The 30 days ended on February 24, 2019 without ALF taking any remedial action.

160.  e-STEPS demanded specific compliance from ALF with the contractual obligation to buy GPS units as the contract required and the agreement to buy between 250 and 300 units monthly for the 12 months of 2019 until the end of the renewed contract, that is, until **December 18, 2019**.

161.  ALF never cured its default and instead reaffirmed its intention of terminating the contract on April 15, 2019.

## VI. TORTIOUS INTERFERENCE WITH e-STEPS BUSINESS RELATIONS WITH ITS SUPPLIERS

162.  e-STEPS repeats and realleges paragraphs 1 through 128 hereof, as if fully set forth herein.

163. As part of the pattern employed by ALF to replicate e-STEPS technologies, ALF intentionally interfered with contracts that e-STEPS had entered with its suppliers to be able to comply with its contractual obligations with ALF.

164. For the sale of the GPS units, e-STEPS entered into a contract with a GPS supplier named CalAmp.

165. In January 2019, e-STEPS learned that ALF directly contacted CalAmp and obtained pricing information with the intent to buy GPS units directly from CalAmp and to cause the end of the distribution contract between e-STEPS and CalAmp.

166. Also starting in January 2019, ALF demanded from e-STEPS, directly and through counsel, that it produced "Authorization letters" so that e-STEPS' suppliers would provide tracking services directly to ALF or through a competitor of e-STEPS, namely TRAKSECURE.

167. The service with which ALF is intentionally interfering is part of the infrastructure that e-STEPS' owns and operates and also part of the platform that constitutes e-STEPS' copyrighted intellectual property for tracking vehicles pursuant to the contract.

168. This conduct demonstrates ALF's ADDITIONAL intent to appropriate e-STEPS' business in the form of its relationships with suppliers which are an essential component of the service e-STEPS provides and the copyrighted technologies that e-STEPS uses to provide GPS tracking service.

169. The contracts interfered with by ALF between e-STEPS and its suppliers are in force and were in force at the time of the interference.

170. In addition, e-STEPS knows that ALF has caused, on its own or through TRAKSECURE, the removal of "SIM" ("Subscriber Identification Module") cards that belong to e-STEPS and that contain e-STEPS' confidential information protected by contract against disclosure to third parties and that those third parties can use to copy the technology and services that e-STEPS provides.

171. The aforesaid is another breach of the contract which prohibits copying technologies offered by e-STEPS under the contract and which is a violation of the license granted to ALF by e-STEPS.

172. Moreover, the conduct alleged in paragraph 169 constitutes a breach of the confidentiality clause which prohibits ALF to reveal to a third party protected confidential information like the identification numbers in the "SIM" cards.

173. The conduct described in paragraph 169 also harms e-STEPS by interfering with contracts with third parties that are subject to specific terms that affect the "SIM" cards and tracking and localization of vehicles.

174. Once ALF caused the removal of the "SIM" cards, it did not give them to e-STEPS so that such conduct is an illegal appropriation of e-STEPS' property.

175. In accord with that, e-STEPS asks this Court to order ALF and/or TRAKSECURE to immediately turn over any "SIM" cards that have been removed from the GPS units purchased from e-STEPS.

176. In the alternative, e-STEPS asks the court to order Defendants jointly and severally to pay e-STEPS $25.00 for each "SIM" card.

177. e-STEPS estimates that there are currently 8,000 "SIM" cards that belong to e-STEPS, the value of which at $25.00 a card is TWO HUNDRED THOUSAND DOLLARS ($200,000.00) which value e-STEPS seeks to be reimbursed by ALF and TRAKSECURE, jointly and severally.

178. All Defendants have conspired to appropriate e-STEPS' protected property.

179. Defendants have obtained gains, profits, and advantage through their illegal conduct.

180. e-STEPS has suffered monetary damages as a result of Defendants' illegal acts.

181. Prior to registering its copyrights, e-STEPS sought to detain defendants' actions through a local state action in the Superior Court of San Juan for breach of the confidentiality clause, the prohibition of reproduction of technologies offered as part of the contract and for tortious interference with e-STEPS business relations. (Civil case SJ2019CV03257)

182. Citing ample discretion to grant injunctive relief, the lack of a copyright registration (which would have taken away the court's subject matter jurisdiction) and without celebrating an evidentiary hearing to consider the preliminary injunction requested it decided to dismiss the provisional

remedy requested and ordered the case to follow the ordinary procedure of a cause of action of breach of contract. The case was thus reassigned to an ordinary civil court.

183. Recently, the ordinary civil judge returned the case to the injunctions courtroom based on ALF's request for reconsideration of the injunctions court's denial of pretrial remedies (that had been already dismissed by a different injunctions court and whose dismissal with prejudice was confirmed by the Appellate Court's three-judge panel thus rendering the remedies as *res judicata*) alleging e-STEPS' refusal to perform elements of a contract that ALF cancelled and requesting compliance with other alleged elements that were not part of the contract.

184. e-STEPS has been left with no alternative but to file this Complaint.

185. e-STEPS seeks a trial by jury.

## V.    DAMAGES

186. For the copyright infringements, in actual damages of no less than **THIRTEEN MILLION SEVEN HUNDRED THOUSAND DOLLARS ($13,700,000)** jointly and severally against all Defendants.

187. For the misappropriation of trade secrets, as exemplary damages in double the amount to be proven at trial, jointly and severally against all Defendants.

188. For the contractual breaches and tortious interference, e-STEPS seeks against all Defendants jointly and severally for their malicious and intentional actions, an amount no less than **FOUR MILLON FIVE HUNDRED THOUSAND DOLLARS ($4,500,000)**

## VI.    SPECIFIC ALLEGATIONS AS TO A PRELIMINARY INJUNCTION

189. e-STEPS seeks preliminary injunctive relief that if not granted will leave e-STEPS irreparably harmed.

190. The copying and/or use and/or disclosure and/or infringement by ALF and or TRAKSECURE of the technologies provided under the licensing of the tracking and location service, first is a copyright infringement, second, a misappropriation of trade secrets, third, breaches the contract,

and fourth, is a tortious interference that caused e-STEPS to lose its competitive advantage forever. This is true given that the knowledge obtained by copying the technologies offered cannot be "unlearned" nor can the breach of the confidentiality contract be "undisclosed." Thus, only a bar to the use of the copyrighted material and the trade secrets will protect e-STEPS.

191.   In addition, e-STEPS should be provided the remedy of the prohibition of disclosing the copyright and/or confidential protected information obtained in breach of contract as a protective measure that, if not granted, would make any judgment moot or ineffective because the harm would be irreparable and irreversible.

192.   e-STEPS also very respectfully asks this Honorable Court to order the United States Marshall to confiscate the trade secrets.

193.   The malicious termination of the contract, effective April 15, 2019, was possible due to Defendants' copyright infringement and breaches of contract that prohibited divulging e-STEPS' confidential information and the copying of the technologies provided by contract, representing 90% of e-STEPS' recurring income exposing it to its demise as an entity, which is considered by the law to be an irreparable harm.

194.   Thus, as preliminary remedy, e-STEPS asks this Court to order ALF to re-instate its contract and order specific performance with the contract until **December 18, 2019**.

195.   The additional preliminary remedies sought derive from the need to protect e-STEPS' copyrighted confidential information on the "SIM" cards together with proprietary right to the "SIM" cards that e-STEPS  acquired through third party purchases (from Telefónica USA and Claro), and are part of the infrastructure licensed by contract to ALF, which, if not granted would also expose e-STEPS to irreparable harm in its contractual relationships with third parties.

196.   The balance of the equities favors e-STEPS. e-STEPS will suffer an irreparable loss to its competitive advantage which "trade secrets", together with the copyrighted information, has been divulged to a competitor (TRAKSECURE) by ALF and said licensed technologies are protected

by a use license. Defendants have copied and divulged to third parties this infringement of the copyright, misappropriation of trade secrets, and breach of contract, which could cause e-STEPS to have to cease operations versus obligating Defendants to comply with the copyright law, the Defend Trade Secrets Act, and their contractual obligations leaves e-STEPS entitled to the preliminary injunctive relief sought.

197. Finally, the public interest will be served by having Defendants honor both federal and Puerto Rico law and their contractual obligations since the rule of law is meritorious.

## IV. PRAYER FOR RELIEF

**WHEREFORE,** plaintiff e-STEPS, LLC**,** very respectfully asks the Court for interim relief in the form of a Preliminary and then Permanent Injunction, and, consistent with that, entry of a judgment against each and every Defendant as follows:

1.    Preliminary and permanent injunctive relief restraining each Defendant and all those in active concert or participation with them, from:

(a)    further infringing in e-STEPS' Copyrighted Work and Trade Secrets and other Confidential Information by producing, distributing, selling, marketing, offering for sale, advertising, promoting, disposing of any products not authorized by e-STEPS;

(b)    making any statement or representation whatsoever that e-STEPS' Copyrighted Work, Trade Secrets and other Confidential Information belong to any of the Defendants;

(c)    effecting assignments or transfers, forming new entities or associations or using any other device for the purpose of circumventing or otherwise avoiding the prohibitions in Subparagraphs (a) and (b);

(d)    secreting, destroying, altering, removing, or otherwise dealing with the work for hire produced for plaintiffs or any books or records which may contain any information relating to the importing, producing, distributing, circulating, selling, marketing, offering for sale, advertising, promoting, or displaying of any of the copyrighted and/or confidential information;

(e)    aiding, assisting, or abetting any other individual or entity in doing any act prohibited by sub-

paragraphs (a), (b),(c), or (d).

2.    Directing that Defendants deliver all copyrighted and confidential information, including, but not limited to source codes and any other related product not limited to documentation and access to cloud servers, in their possession or under their control to the marshal who executes the seizure.

3.    Directing that each Defendant report to this Court within ten (10) days after a Preliminary and/or Permanent Injunction judgment is entered to show its compliance with paragraphs 1 and 2 above.

4.    Directing any other such relief as the Court may deem appropriate to prevent the trade and public from gaining the erroneous impression that the copyrighted, trade secrets, and/or confidential information owned by e-STEPSs is owned by Defendants.

5.    Directing Defendants to return all assets and copies thereof of e-STEPS in their possession.

6.    Directing Defendants to provide an accounting of their profits attributable to Defendants' infringing Plaintiffs' copyrights.

7.    Directing Defendants to destroy or delivery up for destruction all materials in their possession, custody, or control used by Defendants in connection with Defendants' infringing products, including, without limitation, all copies of the infringing material and any products and works that embody any reproduction or other copy or colorable imitation of the copyrighted works, as well as all means for making them.

8.    Directing the United States Marshal to confiscate the trade secrets belonging to e-STEPS, detailed above in paragraph 47**.**

9.    That e-STEPS be awarded jointly and severally from the Defendants the e-STEPS' losses and each Defendants' profits in an amount of no less than **THIRTEEN MILLION SEVEN HUNDRED THOUSAND DOLLARS (**$13,700,000) for the copyright infringements.

10.    For the misappropriation of trade secrets, as exemplary damages in double the amount to be proven at trial, jointly and severally against all Defendants.

11.    For the contractual breaches and tortious interference, e-STEPS seeks against all Defendants jointly and severally for their malicious and intentional actions, an amount no less than **FOUR MILLON**

**FIVE HUNDRED THOUSAND DOLLARS ($4,500,000)**

12.  That e-STEPS be awarded an amount for the damages caused by Defendants' misappropriation of its trade secrets of an amount to be proven at trial.

13.  That e-STEPS be reimbursed all their expenses of this project, in an amount not less than $250,000.

14.  That e-STEPS be awarded costs from each Defendant, including attorneys' fees, based on Defendants' temerity.

15.  That Defendants pay e-STEPS pre-judgment and post-judgment interest.

15.  That the Court consider a referral to the U.S. Attorney if it deems such a referral is warranted.

**I HEREBY CERTIFY** that I have filed this Complaint with the Court's ecf system.


Dated: July 2, 2019

In San Juan, Puerto Rico.

Respectfully submitted.


**FOR PLAINTIFF**
**e-STEPS, LLC**

**BECKER & VISSEPÓ, PSC**

S/Jane Becker Whitaker/
**JANE BECKER WHITAKER**
(787) 945-2406
USDC No. 205110
E-mail: jbw@beckervissepo.com
janebeckerwhitaker@gmail.com

S/Jean Paul Vissepó Garriga/
**JEAN PAUL VISSEPÓ GARRIGA**
USDC No. 221504
E-mail:jpv@beckervissepo.com
 jp@vissepolaw.com
PO Box 9023914
San Juan, PR 00902-3914
Tel. (787) 633-9601

S/Pedro J. Rivera-Rivera
**PEDRO J. RIVERA RIVERA**
1510 Ave. FD Roosevelt Ste 9B-1
Guaynabo, PR 00968
Tel. 787-758-8029; Fax 787-754-0109
Mobile 787-599-3702
E-mail: pjrivera@pjrlex.com